(C. D. 1040)

T. M. DUCHE & SONS, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided January 15, 1947)

*Barnes, Richardson & Colburn* (*J. Bradley Colburn* and *A. MacC. Barnes,* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Harold .L. Grossman,* special attorney), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges; CLINE, J., dissenting

KEEFE, Judge: This case arising at the port of Boston involves the collector's assessment of duty on certain dried' egg albumen imported from Tientsin, China, and entered on February 17, 1937. The collector assessed duty at 27 cents per pound under paragraph 713 of the Tariff Act of 1930, as amended by the proclamation of the President, T. D. 44997, issued under section 336 of said act. The plaintiff claims that the Presidential proclamation, T. D. 44997, is illegal and void, inasmuch as no investigation of the cost of egg products in the United States, as provided by statute, was made; that there was no industry in the United States in existence engaged in the production of dried egg products during or prior to the time of such investigation; and that the merchandise is properly dutiable at the rate of 18 cents per pound, or at 11 cents per pound under paragraph 713, or at 20 per centum ad valorem under paragraph 1558.

At the trial it was stated by plaintiff's counsel that the merchandise in question is substantially the same as the dried egg albumen involved in *T. M. Duche & Sons et al.* v. *United States,* 13 Cust. Ct. 26, C. D. 863, wherein it was also claimed that the Presidential proclamation, T. D. 44997, was an illegal exercise of delegated power, and illegal and void because the Tariff Commission's investigation and report to the President, dated June 16, 1931, upon which the

proclamation was based, showed that there was no domestic dried egg albumen industry nor any "domestic article" for which a finding of cost of production could be made, as required by section 336, Tariff Act of 1930, during the period covered by the investigation. Counsel admitted that it was the intention to appeal the *Duche* case, *supra*, but inadvertently it was overlooked, and the present case was presented in order to proceed to a review, in case this court adheres to its original position, after considering additional arguments of counsel. Counsel for the Government admitted that the merchandise and the issues here are substantially the same as in the *Duche* case, *supra*. Plaintiff's motion to incorporate the record in that case as part of the instant case was opposed by the Government on the ground that this court is without authority to review the evidence taken before the Tariff Commission and the report of the Commission based upon such evidence. Inasmuch as the parties to the controversy were the same, the merchandise was the same, and the issue in the *Duche* case, *supra*, was identical with the issue presented in the instant case, the court granted the motion of plaintiff admitting the record in question, which includes the record in *David L. Moss Co., Inc.* v. *United States*, 26 C. C. P. A. (Customs) 381, C. A. D. 45. No other evidence was presented.

It is contended in plaintiff's brief that the decision of the Supreme Court in *United States* v. *George S. Bush & Co., Inc.*, 310 U. S. 371, T. D. 50159, has no application to the case at bar for the reason that it involved no question of procedural or jurisdictional defects in the proceedings before the Tariff Commission and the proclamation of the President. Plaintiff contends that in the case at bar the protest is based upon the claim that the entire proceedings of the Commission and the President are invalid; that the Commission has exceeded the power conferred upon it and its investigation and findings, and the President's proclamation based thereon, are illegal because of failure to satisfy express jurisdictional requirements of the statute.

The jurisdictional requirements of section 336 of the Tariff Act of 1930, here involved, insofar as institution of the investigation, the public notice of hearing, the hearing, and report to the President with recommendations were concerned, were complied with. Plaintiff seeks to have the court reverse its decision in the *Duche* case, *supra*, because of evidence contained in the Commission's report to the President. We held in that case that the testimony taken before the Tariff Commission and the Commission's report should not have been received in evidence. Although we admitted the record in the *Duche* case in the instant case, such admission was subject to our holding as to the admissibility of those documents, as set forth in the decision, which were part of the record. Therefore, we have before us no evidence of the lack of either a domestic industry or a domestic article

which might be used as a basis for the comparison contemplated by section 336, *supra*.

We are of the opinion that this court is not empowered under the statute to examine the report of the Tariff Commission and the evidence before it in order to determine whether or not the findings of the Commission were based upon substantial evidence. The well-settled principle of law which may be appropriately applied here limits judicial inquiry to an examination of the proceedings of the Tariff Commission to ascertain whether the jurisdictional require-ments of the statute, section 336 of the Tariff Act of 1930, have been complied with. To go further, however, and explore the reasons which actuate the President in the exercise of his judgment in making his proclamation or to weigh the evidence before the Tariff Commis-sion would transcend the province of the courts in cases of this nature.

In our opinion, whether or not we may judicially inquire into the proceedings of the Tariff Commission, weigh the evidence presented before that body to determine whether it would substantiate the report made to the President, or question the reasons underlying the Presidential proclamation, are questions fully covered by the Supreme Court in the *Bush* case, *supra*. In that case it was claimed that the Tariff Commission erred in its method of converting the Japanese yen currency into United States dollars as a basis for figuring the esti-mated duty. The Supreme Court there stated that—

\* \* \* The President's method of solving the problem was open to scrutiny neither by the Court of Customs and Patent Appeals nor by us. Whatever may be the scope of appellate jurisdiction conferred by § 501 of the Tariff Act of 1930, it certainly does not permit judicial examination of the judgment of the President that the rates of duty recommended by the Commission are necessary to equalize the differences in the domestic and foreign costs of production.

and furthermore—

\* \* \* It has long been held that where Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, *the judgment of the officer as to the existence of the facts calling for that action is not subject to review.* [Italics not quoted.] *Martin* v. *Mott*, 12 Wheat. 19; *Monongahela Bridge Co.* v. *United States*, 216 U. S. 177; *Dakota Central Telephone Co.* v. *South Dakota*, 250 U. S. 163; *United States* v. *Chemical Foundation, Inc.*, 272 U. S. 1. As stated by Mr. Justice Story in *Martin* v. *Mott, supra*, pp. 31–32: "Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts."

In the *Duche* case, *supra*, it was contended that the Presidential proclamation, in reference to dried egg albumen, was null and void because there was no industry in the United States producing that product during the period set for the investigation by the Tariff Commission. It was also urged that no cost of production of the

domestic product could be determined, and consequently the difference in cost of production between the domestic merchandise and that of the chief competing country could not be ascertained. We there held that if Congress had desired that the court should review such evidence for the purpose of determining whether the findings of the Tariff Commission were supported by the facts, it would have made provision therefor, and the protests were overruled. The decision·in that case was unanimous and, as stated above, no appeal was taken. We are of the opinion that the decision in the *Duche* case, *supra*, is to be followed unless a good reason is shown why we should reverse that case. No such reason, nor change in the law or the facts, is here presented.

The cases relied upon by the plaintiff, wherein observations and judicial dictum in related cases such as *Hampton, Jr., & Co.* v. *United States*, 14 Ct. Cust. Appls. 350, T. D. 42030, affirmed in 276 U. S. 394, are stressed, have been repudiated in principle by the decision of the Supreme Court in the *Bush* case, *supra*. In the case of *David L. Moss*, *supra*, also relied on by the plaintiff, the majority of the court concurred in the view that while it was not the function of the court to weigh the evidence and determine the facts, it may go behind the report of the Tariff Commission to determine whether the finding of the President and the Commission that dried egg albumen was a domestic article is supported by any substantial evidence. The *Moss* case, however, was not appealed to the Supreme Court, presumably because our appellate court came to the conclusion that there was sufficient evidence to support the finding of the President. That case, however, was decided prior to the *Bush* decision, and in view of the Supreme Court's holding in that case, it would seem that our appellate court would not have given approval to the examination of the evi-. dence in the *Moss* case, *supra*, if it had had the benefit of the Supreme Court's expression of opinion in the *Bush* decision.

It is contended on behalf of the plaintiff herein that as this case arose by way of protest under authority of section 514 of the Tariff Act of 1930, this court possesses jurisdiction to judicially examine the facts upon which Presidential action under section 336, *supra*, is based to determine whether the requirements of the statute are met. The basis of this contention is the language of said section 514 which provides expressly that protests may be filed against all decisions of collectors as to the rate and amount of duties chargeable "including the legality of all orders and findings entering into the same." This language was not considered in the *Bush* case, *supra*, in which the jurisdiction of the court was derived from section 501 of the same act, relating to reappraisement cases. The scope of appellate jurisdiction conferred by the latter section is expressed therein in the broad language granting a right of appeal to either party on a question or

questions of law only. Plaintiff contends that had the *Bush* case, *supra*, involved a suit under section 514 rather than section 501, the Supreme Court might have arrived at a different conclusion. We find no merit in this contention in view of the broad language of section 501, granting appeal on questions of law. Moreover, that question was passed upon in the *Duche* case, *supra*, and decided adversely to plaintiff's contention.

While the statute, section 336, refers to the cost of production "of any domestic article," plaintiff argues that there is a necessity for the existence of a domestic *industry* notwithstanding the fact that section 336 (h) (1) states that "the term 'domestic article' means an article wholly or in part the growth or product of the United States * * *." Inasmuch as Congress has expressly defined "domestic article" in precise terms, it is not apparent why the court should seek to enlarge the section by insisting that there must be a domestic industry as urged by the plaintiff. The fact that at the time of the investigation in question there may have been a great disparity in the degree of production of the foreign and domestic articles, respectively, is a matter of no concern to the court.

For the reasons stated, and following the Supreme Court in the *Bush* case, *supra*, we are of the opinion that the *Duche* case, *supra*, should stand as the law. Judgment will therefore be entered in favor of the Government.

### DISSENTING OPINION

CLINE, Judge: I regret that I am unable to agree with my associates that this court has no authority to determine whether or not the Presidential proclamation increasing the duty on dried egg albumen is valid. In the instant case, the validity of the proceedings before the Tariff Commission is questioned because it is claimed that no domestic article and no cost of production of such articles existed which could form a basis of comparison with foreign articles and foreign costs of production.

It is clear from a reading of section 336 of the Tariff Act of 1930 that the existence of a domestic industry is a prerequisite to the operation of the flexible tariff procedure. Changes in rates are authorized by this section only when necessary to equalize the differences in costs of production of like or similar domestic and foreign articles. The cost of production of a domestic article is defined to include the cost of materials and labor and the usual general expenses incurred in the production of the article, the cost of containers and coverings incident to placing the article in condition packed ready for delivery, the transportation costs incident to delivery to the principal market or markets in the United States, and other relevant factors constituting an advantage or disadvantage in competition.

When there is no evidence that a domestic article has been produced and sold in commercial quantities, how can transportation costs and other costs incident to delivery to the market or markets for the article be obtained?

Moreover, it is specifically provided that where the Commission finds that costs cannot be equalized by changing the rates of duty, it shall report such ad valorem rates of duty as, when based upon the American selling price of the domestic article, will equalize the differences in costs of production. Certainly, there can be found no differences in costs of production if there is no domestic article; there can be no cost of production as defined by section 336 where there is no domestic industry; and the American selling price of the domestic article cannot be found in accordance with section 402 (g) where no article is produced in the United States nor offered for sale to all purchasers in the principal market in the United States in the ordinary course of trade and in the usual wholesale quantities. An industry must be a going concern, able and willing to supply a commodity in wholesale quantities to the market. The history of customs litigation is replete with evidences of the judicial acceptance of this basic idea. Here the facts reviewed amply support the report of the Tariff Commission that "No domestic industry existed and no domestic article was produced or sold in the ordinary course of trade in wholesale quantities."

Congress had the power to place duty on an article in order to *create* an industry in the United States, but did not do so, and did not delegate such authority, nor is there anything in the flexible tariff provisions indicating that it intended to foster nonexistent domestic industries by means of a Presidential proclamation increasing rates of duty. Should the President assume to act in a case where no domestic industry exists, his action is beyond the scope of the authority delegated to him. The question which then arises is whether this court may pass upon the legality of the Presidential proclamation. I think that question was fully answered by the Court of Customs Appeals when it passed upon the constitutionality of the flexible tariff provisions in the Tariff Act of 1922 in *Hampton, Jr., & Co.* v. *United States*, 14 Ct. Cust. Appls. 350, T. D. 42030 (affirmed 276 U. S. 394) at page 369:

But when, in the performance of his duties, under this section, the President proclaims a change of duty, if, in so doing, he acts beyond the law or fails to comply with its express mandates, then we can not doubt that the person aggrieved thereby may find adequate relief in the courts. We need not go beyond the case at bar for an illustration of this. Here the importer has protested against the imposition of additional duties because of the alleged unconstitutionality of the act under which it was imposed, and upon that claim he is entitled to a proper hearing in the courts. Can it be denied that if, in the imposition of

this rate of duty, the President had proceeded without taking the steps directed by section 315, the importer could have set these facts out in his protest and had an adjudication thereon? To deny this would be to give to the act of the President a peculiar sanctity and inviolability not attaching to the acts of other officials of the Government performing similar fact-finding duties; and this we are neither called upon to do nor justified by the law in doing. We are unable to see why any different rule of law should be applied to the President's finding of facts under section 315 than the one applied to the finding of valuation by an appraiser of merchandise at our ports. In such cases, while the courts have held the finding of valuation made by the appraiser to be conclusive, if he proceeds upon a wrong principle, contrary to law, his acts are subject to judicial control and correction. *Badger* v. *Cusimano*, 130 U. S. 39; *Robertson* v. *Frank Bros. Co.*, 132 U. S. 17 (24); *Muser* v. *Magone*, 155 U. S. 240 (247); *United States* v. *Passavant*, 169 U. S. 16 (21).

The principle laid down by Congress in section 336 is that rates of duty may be changed by the President only where necessary to equalize costs of production. If a change is proclaimed where it is unnecessary because there is no difference in costs of production or because there is no domestic industry upon which to base a comparison, the President is proceeding upon a wrong principle, and his acts are subject to judicial control and correction. See also *David L. Moss Co., Inc.* v. *United States*, 26 C. C. P. A. 381, C. A. D. 45, at pages 382 to 383, where the court said:

It is true, as pointed out by counsel for the Government, that the Customs Court is given no direct right of review over action of the Tariff Commission. This does not mean, however, that it is without power to consider the legality of increase of duties resulting from the commission's action. The court is a court of law, and it is granted full power to relieve against illegality in the assessment or collection of duties, 19 U. S. C. A. 1515, 1518. If relief may not be had before it against illegal action under the flexible tariff provisions, relief may not be had anywhere; for its jurisdiction in such matters is exclusive. It is the tribunal established by Congress in the provision of a complete system of corrective justice for the administration of the customs laws, and questions involving the validity of official action in the imposition and collection of duties are properly cognizable before it to the exclusion of other courts. [Citing cases.] There can be no question but that courts must exercise the judicial power vested in them to determine the legal validity of administrative action, where the validity of such action is involved in questions properly before them, whether they have been granted the right of review over action of the administrative agency or not. The duty necessarily arises because of their obligation to decide cases before them according to law. [Citing cases.]

I do not think the decision in *United States* v. *George S. Bush & Co., Inc.*, 310 U. S. 371, repudiates the principles expressed in the above-cited cases. In that case it was held that, since the statute contained no provision concerning the conversion of currency, the President's method of converting was not subject to judicial review; that section 501 of the Tariff Act of 1930 did not confer jurisdiction to examine the judgment of the President that the rates of duty

recommended by the Commission were necessary to equalize the differences in foreign and domestic costs of production; that the judgment of the President based upon facts found in accordance with a procedure prescribed by Congress is not subject to review.

In the instant case the statute does require that a domestic article and a domestic industry exist in order that a comparison of costs of production with those of foreign articles may be made. The question here is one of jurisdiction of the President to act at all. Jurisdictional questions are open to judicial review. No such question was involved in the *Bush* case, *supra.*

Since a change of rate may not be validly made where no domestic industry exists and since this court may pass upon the legality of the President's proclamation, I turn now to the status of the dried egg albumen industry in the United States during the period covered by the report of the Tariff Commission (1928–1930). The only evidence submitted in the instant case is the documentary evidence contained in the incorporated case of *T. M. Duche & Sons et al.* v. *United States,* 13 Cust. Ct. 26, C. D. 863, consisting of a copy of the Senate Resolution directing the Tariff Commission to investigate differences in costs of production of dried whole eggs, dried egg yolk, and dried egg albumen; a copy of the public notice of investigation issued by the Commission; a copy of the testimony taken at the hearing held by the Commission; copies of documentary exhibits introduced in the Commission's investigation; copies of depositions of witnesses not in attendance at the hearing; and the report of the Tariff Commission, No. 25, entitled "Report to the President on Dried Egg Products."

It was held in *David L. Moss Co., Inc.* v. *United States, supra,* that the court may review facts found by the Tariff Commission, not to substitute its judgment for that of the Commission, but in order to determine whether there was substantial evidence before it upon which to base its action. For that purpose only, the report of the Tariff Commission and the evidence submitted to it is examined. These documents indicate that from 1918 until 1927 there was only an occasional, experimental production of dried egg products in this country; that in 1927 two companies dried whole eggs and egg yolks; that in 1929 one company tray-dried about 100,000 pounds of liquid whites, partly to salvage them; that in 1931 another company experimentally produced some dried eggs; and that a few other firms had dried egg albumen experimentally. On page 7 of the report of the Tariff Commission, it is stated:

The commercial production of dried eggs in the United States ceased after 1916. In 1927 deliveries from China were interrupted by civil war. The prices of shell eggs in this country were then quite low, and two domestic plants dried several hundred thousand pounds of whole eggs and yolks. These two plants operated again for a short time in 1930, when domestic shell eggs sold for less than in 1927,

and again for a brief period in 1931, when prices were still lower. The output of dried eggs at all times was very small as compared with imports and was insignificant as compared with the domestic production of frozen eggs or of shell eggs. *There are, however, a large number of milk-drying plants in the United States, a majority of them in the chief egg surplus region, and they can be readily adapted to the drying of eggs.* But because of the low prices at which imported egg products have been available, there has been little incentive for these plants to engage in egg drying. [Emphasis supplied.]

The finding that there were in existence milk-drying plants which could be adapted to the drying of eggs, does not alter the fact that the record discloses no evidence of such adaptation.

In computing the cost of production of dried egg products, the Tariff Commission reported that it used the actual costs of drying obtained from establishments that were engaged in that business, but that in respect to raw materials, it used the weighted average of farm and central market prices of breaking stock eggs delivered at *freezing* plants.

On this record, I find that there was no domestic dried egg albumen industry in the United States during the years 1928 to 1930 and that the only production of such merchandise was on an experimental basis. In my opinion, therefore, the Presidential proclamation of June 24, 1931, is illegal and void insofar as it purports to increase the rate of duty on dried egg albumen from 18 cents per pound to 27 cents per pound. The protest should be sustained and the merchandise held subject to duty at 18 cents per pound under paragraph 713 of the Tariff Act of 1930.